Good morning, Your Honors, and may it please the Court. Andrew Jacobs with Charles Giannulloni for the Appellants Abdou and Bacchus. This Court should vacate the injunction for lack of the required weighing of the public interest as compelled under Winter. Since the Supreme Court decision in Winter, it's been very clear that there's no question that a movement for the extraordinary relief of injunction needs to fulfill all four of the prongs, and this record discloses very palpably and very clearly the failure, to comply with the fourth prong, any showing of the injunction being in the public interest. I thought the District Court's found the public interest here was in the sanctity of contract. There is essentially a half sentence in the District Court's order that refers to the importance of contract, and that's all the District Court did. Well, if the District Court cited to the element and explained what it thought the public interest was here, then do we not examine the District Court's decision under the abuse of discretion standard? Well, I would say no, Your Honor, in two reasons. One is the Winter case, and one is the Caribbean Marine Services case. There's both a U.S. Supreme Court case and a case from a panel of this Court that basically say when you have a fragment of a sentence, less than one sentence, that just sort of pays lip service to one side's characterization of public interest. That's not just lip service. That's the substantive law of the State of Nevada, as I read the Nevada cases. So the fact that the District Court judge didn't enter into an extended exegesis on the law of public interest and sanctity of contracts isn't required, is it? What is required is a weighing of the competing public interest. Winter is clear about that. Caribbean Marine Services is clear about that. There has to be a weighing, and when you mention the one concern, the primacy of contract, which the District Court mentioned, and you omit altogether to mention in the injunction order the competing compelling public interest in competition, you have not even minimally, satisfactorily weighed competing interests. Did the District Court go through each of the Winter's factors in some depth? No. It did not, respectfully, Judge Lamel, because when you don't even mention the competing interest, it cannot. It found that each of the Winter factors favors DeVita, right? He asserted that as a conclusion. He did not provide the weighing. He did not even mention. But given the citations of the record concerning the privity issue that Judge Talman mentioned, along with the District Court's weighing, referencing Winters, or what have you, aren't you reading the District Court's opinion as somewhat narrow in the sense that you believe more was needed other than a few sentences or two? And I just, you know, to say that a District Court needs to expound more upon its findings by adding more details into the record, sometimes a one-sentence explanation of a finding could be sufficient. Judge Lamel, I very much appreciate the questions from Your Honor and Judge Talman. The cases speak of a required weighing. And when you say freedom of contract is provided for in my injunction, you're not visibly weighing anything. He has not even identified the competing concern and, therefore, not weighing it. And that is what occurred in Caribbean Marine Services. And Judge Wallace wrote a really nice explanation of how that works. You've got to actually explain what the other interest is and weigh it. And it's not putting the District Court to some unreasonable proof. It's that the District Court didn't even acknowledge the enormous anti-competitive effect of this two-year injunction. But, counsel, if the standard of review is abuse of discretion and the District Court correctly cites all four of the winner's factors and then addresses each of those factors, however briefly, in the District Court's order, why don't we apply our decision in United States v. Hinkson and declare that the District Court's weighing of the public interest factor is a plausible resolution of that factor based on the record? Well, and, again, because other law in the circuit in this specific context says that the weighing needs to at least identify the other factor and step through the other factor. And that's Caribbean Marine Services. And it's not mentioned. But Hinkson is an in-bank decision, which I believe postdates Judge Wallace's opinion, does it not? Well, it does. It does. And I'd just like, then, to turn to one more point about public interest here and its relationship to irreparable harm, which the panel may have more interest in based on the questions at this point. There is a hydraulic and inverse relationship between the public policy issue and the alleged harm, which is to say the Court indicates in its order declining to revise the injunction of March 7 at ER-1 that the restricted parties apparently prefer to work with the plaintiffs and view them as the most viable option. Now, we think that's really strong evidence that the injunction deserves competition because the district judge is recognizing that the other market players believe that our clients would actually aid competition. But that's the harm. If there is an imminent harm, that's to be found in this record. Counsel, that also shows that the district court was well aware of the competing harms and the issues because it's all about the non-compete. It's not like this was a secret that competition was the countervailing factor. But I have a question about the motion to dissolve the injunction following the relationship that Devita entered into. What is the status of that proposed merger or sale? Per public information, Your Honor, it is still pending regulatory review and approval by the government. So right now in its financials, the business unit is being listed as not operating for current purposes. It's anticipated that it will close, but it remains under government review. However, Is there anything that is either in the record or in the public domain that suggests when, if ever, that will conclude? There were suggestions in the record from six months ago that it might close by July. There's nothing in the record of the public that I've seen so far that would give the panel a better view, and I've asked people privately, and we just don't really know, Judge Graber. So turning then to the factor of imminent harm, I think that there's an analytic error here. And from our point of view, all of the different prongs have been collapsed into the determination on the merits. The district court clearly believes there's been a breach, was very clear in stating his concern that he believed there was a breach. We respect and understand that as to the first factor. But when you look at what the court found about Humana, the injunction, to be clear, is not avoiding an identified imminent harm in the future. The complaint the court seems to have about Humana is of a completed harm, for which a damage remedy should be full and sufficient. The court is saying, you messed up the relationship with Humana. Humana, starting January 2019, will not be working with us exclusively. And every day in America, in federal courts, experts from places like Cornerstone go into court, and they quantify, and they provide damage measures when you have claims like that. I thought your client stipulated in the settlement agreement, when they took the extra $25 million in payment from DeVita, that there was essentially an agreement that if they violated the terms of the injunction, the harm would be irreparable, even though it was difficult to quantify. And, Judge Tallman, under International Association of Plumbing, it's circuit law from the panel of this court that irreparable harm cannot be presumed from the contract. So, I'm aware the words are there, but the inquiry still needs to be done. Well, presumed from the contract, but there's an express contract provision that essentially stipulates in advance that if a violation is shown, that there is irreparable harm. I haven't looked at the underlying contract in the case you just cited, but I suspect that language is probably conspicuously absent. But circuit law, Judge Tallman, and we briefed this, and I provided the case site now. The circuit law, as we understand it and as we've cited it to the court in the briefing, is that you cannot stipulate to the fact of the irreparable harm, and so the court still has to go through the mechanics of identifying what that future harm to be avoided is. Why can that not be consideration for the contract? It may have been consideration for the contract, but that doesn't really alter the Rule 65 analysis that the court is required to find, and it's their burden, not ours, that it's in the public interest and that there's an imminent harm to be avoided by this specific injunction. And even if you assume for the sake of argument that one shares very strongly the district court's concerns, you cannot collapse those inquiries all into one inquiry. If the court turns out later to be right that there's breach, that's supposed to be resolved by judgment, not by the extraordinary under Winter and preliminary remedy of this injunction. So are you arguing that there was no breach of the agreement? It's plainly a question to be determined by the district court later. What's been resolved for now is that under Rule 65, the court determined that there was a likelihood of success on the merits. We concede no more, and we don't need to for purposes of the argument, I believe, Judge Tallman. But the district court did devote a substantial part of its preliminary injunction in order, identifying the conduct that your client's engaged in that was found to be in violation of the contract. And that is not the appeal that we have, respectfully, Judge Tallman. That's why we wanted to focus on the three prongs that we think were clearly erroneous. We did not focus on that prong. Well, excuse me, counsel. The district court also discussed irreparable harm at much greater length than what you are suggesting and didn't rely entirely on actual disruption of one of the contract relationships. But primarily, it seems to me, relied on the opportunity cost of goodwill and so forth that can't necessarily be quantified. So I'm not sure. The court gave, I think, four or five listed reasons under irreparable harm, and only one of them dealt with what you're calling measurable harm. So what's wrong with the other ones that weren't quantifiable? Well, I think what's wrong with the lower court's assertion that it is not quantifiable because it's in the nature of goodwill is that DeVita monetized its goodwill. That might have been true before they sold the business for $4.9 billion. They haven't sold it. That's why I was asking the question earlier. Well, the transaction remains pending. There is an inked contract to sell it, and they have monetized it. So it does have a definitive value in the market. Have they received the money? No, apparently not. I'm not suggesting it's closed. Point taken, Judge Graber. It is not closed. But it also indicates that it has been monetized. But I think the key analytic error here, and I really believe it's an error with respect to the analytic process in the text of this order, is that the order collapses past breach into future irreparable harm. You can assume that there is a breach for purposes of an analysis of this. You know, we're not conceding it for the litigation, but assume for the sake of argument there just is a breach. They still have to prove that the past breach is going to cause a harm in the next year or year and a half. And that's their burden. And they did not fulfill that burden. But even if you consider the $4.9 million, how do we know that they wouldn't have been able to sell it for $5.9 million had the breach not occurred? Well, that's not an argument that they made in the court below, Your Honor. And the fact of it is that it does remain monetized. If I could please reserve the remainder of my time for rebuttal. You're free to do that. Thank you. Thanks, Your Honors. May it please the Court. Good morning. My name is John Bailey. I'm here with Paul Williams and Josh Dickey on behalf of the appellees. The issues before this Court on Appeal are relatively straightforward. It is whether Judge Gordon abused his discretion in issuing a preliminary injunction that was narrowly tailored to restrict Drs. and Baucus from engaging in prescribed activities with only three entities and only in the State of Nevada. And this was done in the face of undisputed contemporaneous evidence showing that they had breached their restrictive covenants by misappropriating, damaging, impairing, disrupting, and exploiting the goodwill that DeVita paid them $5 million not to do. Let me address a couple of the questions that you asked opposing counsel. With respect to the public interest, if you look at the excerpt of record, page 169, because the two cases were consolidated, both the injunction case and the order denying the motion to dissolve, there's a 2017 and a 2018. I'm talking about the excerpt of record for the 2017 portion of the transcript where the judge talks about the public interest. You are correct. He talks about it both in the order, he talks about it in the transcripts, and he talks about it in the preliminary injunction. To say that he did not weigh public interest would be a complete misnomer and misstatement. You are correct that he identified what the public interest is. In order to identify the public interest, he certainly had to weigh it and think about it, and he discussed it with us at the time of the hearings. Counsel is correct that the sale, the proposed acquisition is pending. It's in progress. It's still being reviewed by the Department of Justice. Is there any indication that is either in the record or in the public domain that's judicially noticeable about what the status of that proposed sale is and when it might conclude? To my knowledge, there is not. I believe the parties are waiting for the Federal Trade Commission under the HRS Act to review any anti-competitive impacts that the proposed acquisition may have. But as to whether it will close and at what point in time, if it will close, when that will occur, I have no idea. It's in the hands of the Federal Government. Let me address the question that you had about the tolling aspect of the agreement between the parties. It is correct that the law in this circuit and in other circuits is the recitation in a non-compete agreement, in a sale or employment non-compete agreement, the recitation that the parties agree that if the breaching party, in fact, does breach, that that will create irreparable harm to the non-breaching party and, therefore, be appropriate for injunctive relief. The law is that that recitation alone is not sufficient to satisfy the element of irreparable harm. In this case, we have all of the other factors that Judge Gordon alluded to in terms of the extensive meetings, the extensive strategizing, the plans put in place between Doctors Adu and Bacchus with our contractual parties in order to damage us in the marketplace. He also discussed, and you see in the record and you've mentioned, the fact that they have caused, or at least played a part in, Humana terminating the exclusivity provision in our contract with Humana. So in addition to the parties agreeing in the covenant that their breaching of the restrictive covenant due to their knowledge, due to their relationships, and due to their abilities in the market, their breaching would create irreparable harm, justifying injunctive relief. We also have all of these actual activities that took place to satisfy that important element of likely to incur irreparable harm. In addition, the parties agreed that if a breach were to occur, the remedy would be the tolling for the period of the breach. Now, this is no different and is consistent with this Court's opinion in Ocean Beauty v. Pacific Seafood, where this Court said, irrespective of having that provision in the agreement, that there is the ability for the Court, under its equitable authority, to have what this Court referred to as equitable extension. And that's precisely what we have here, and this is precisely what Judge Gordon did, was he could rely not only on Ocean Beauty, but also the parties' agreement itself. The only way that the Court could have satisfied the parties' intent, given the conduct that was unequivocally demonstrated on the record, was to do exactly what Judge Gordon did, which was to impose the preliminary injunction in a very narrow fashion, subject to modification if there's additional evidence that comes forward. Did the modification contemplate narrowing it further in terms of geographic scope? What Judge Gordon said to both parties in court was, Go do your discovery. If there's additional evidence to support either expanding the scope of the preliminary injunction or reducing the scope of the preliminary injunction, we will get to that, bring it to me, and I will take it under consideration. He was very judicious, though, in making sure, despite what the parties agreed to. The parties agreed that if there's a breach, the entire covenant, restrictive covenant, gets extended for the period of the breach. Judge Gordon was very judicious in the fact that he narrowly limited the preliminary injunction to only deal with the three parties that he had evidence of the breach in front of him. In fact, we have engaged in discovering, we've cited in one of our footnotes, that we have obtained additional information from one of those parties that suggests to us that the breach period was much greater than the 22 months that we had first found out about, that it was six months that they had started breaching their restrictive covenant, six months before that period of time. That is pending in front of Judge Gordon right now. Unless you have any additional questions for me, I will submit it on the record and ask you to keep in mind that there is no evidence of an abuse of discretion here by Judge Gordon and to affirm that decision. Thank you, Counsel. Thank you. Mr. Jacobs, you have some rebuttal time remaining. I'd like to go first to Judge Lammel's question, Northern Nevada. Let's talk about Northern Nevada for a minute. In the original hearing in November 2017, Judge Gordon was clear, I'm going to explore this, I'm going to let you look at this. If there's no evidence that DeVita was going to Northern Nevada, then that would be a reasonable way to reform this injunction. And, of course, the law calls for narrow tailoring, as we all know and acknowledge. So what happened after that? There was a discovery. Mr. Gemowa from Prominence, which is a Washoe County, Northern Nevada-based insurer, came back and said, nope, they've just never talked to us at all. Despite the seeming importance of the injunction allowing DeVita to get more runway, to reestablish goodwill, they then, after going in and passionately declaiming how they needed to get this goodwill, never talked to Prominence. So when we obtained the actual evidence and testimony and put it in front of the district court in February of this year, the district court was completely unmoved. There was no contrary demonstration. If you go back and look at the hearing transcript, there was the argument of their counsel saying, well, that's not how we think it is. We had competent evidence from an insurer, from the chief operating officer, saying they never talked to us. And the court said in November 2017, I would look at that, that would be a reasonable thing to do. If the court is not inclined to consider the public policy implications of 135,000 people here who are basically going to be under an 80 percent market domination by DeVita, we would really implore the court to please look at northern Nevada, where they haven't even gone. There's not a straight-faced contention here that there's a goodwill issue in northern Nevada. They have not been disadvantaged. They did not go there. They're not talking to Mr. Gemowa. And there's just no reason for the injunction to be broader than it has to be. So that was one thing that we would like to clarify. Also, with respect to the tolling, what's really interesting about the tolling here is that the court seems to have treated this, and counsel in his argument, he sort of very, did it very artfully, I thought. He explained how it was, you know, sort of indisputably shown there's a breach. There's no summary judgment in this case there's a breach. The contract says if there's a breach, you have tolling. The district court just sort of slipped over that and said, well. Sotomayor. Well, it's a likelihood of success, and if the, so the court is dealing with a likelihood of success on breach, which then translates to a likelihood of success on tolling. Well, it translates into a likelihood of success, but the requirement of narrow tailoring that's inherent in the law here also calls, just as we don't, you know, have the injunction in Florida where there's no operations that are implicated, the injunction should also be that where there's a harm. The court seemed to think Humana was a harm. That harm only goes back to, at the earliest, ER, page 1022, December 11th of 2016. And then the court has bootstrapped that into a 22-month tolling period. And it does that based on a discontinuous discussion from the first quarter of 2016 that never came to anything. There's no evidence in this record of it coming to anything. Counsel, I was pretty impressed by the draft business plan. I mean, that's a pretty detailed preliminary document. Judge Tallman, I totally get and appreciate the question, and it accurately reflects Judge Gordon's concern. I get it. And I would say back to you, and I would really ask that the Court please consider this idea a little bit further, that that goes to breach. If you don't like the business plan, it goes to breach. That doesn't mean... But it does show the depth of the negotiations and the detail that they were considering, notwithstanding their characterization that these were high-level discussions. And, again, I get it. And, again, that would go to why we might lose at trial and there might be a judgment that that business plan is a breach. But does that business plan create the imminent likelihood of economic harm and harm in 2018 or 2019? There's no linkage there. It appeared to me that what influenced the district court was that no sooner was the ink dry on this agreement than your clients set out to engage in conduct in violation of it. And I'm frankly not surprised at counsel's representation that he found evidence that's six months earlier than the 22 months that was last before the district court. Counsel, I believe that, as you've repeatedly said throughout your argument here, that you get it. I'm not certain if your clients did. Judge Lamell. And maybe that's what Judge Gordon was factoring in, the likelihood of... Reading the transcript, I think, Judge Lamell, you are channeling some frustration that Judge Gordon, I think, very sort of elegantly and politely expressed. I would still urge Your Honors to please look at Northern Nevada. That goes to what Judge Gordon said was fair and appropriate.  Thank you, Your Honors. Thank you, Counsel. The case just argued is submitted, and, again, we appreciate very helpful arguments from a very skilled counsel on both sides. We are adjourned for this morning's session. Thank you.
judges: Graber, Tallman, Lemelle